# 𝔍n the 𝔘nited 𝔖tates 𝔅ankruptcy 𝔒ourt
# for the
# 𝔖outhern 𝔇istrict of 𝔒eorgia
### 𝔖avannah 𝔇ivision

FILED
Lucinda B. Rauback, Clerk
United States Bankruptcy Court
Savannah, Georgia
By dreese at 12:40 pm, Jan 15, 2016

In the matter of: )
)
)  Chapter 11 Case
)
SHREE MELDIKRUPA INC. )
)  Number <u>15-41411-EJC</u>
*Debtor*. )
)

## OPINION ON DEBTOR'S AMENDED MOTION FOR ORDER TO USE CASH COLLATERAL

Before the Court is debtor Shree Meldikrupa Incorporated's ("Debtor") Amended Motion For Order to Use Cash Collateral ("Amended Cash Collateral Motion") (dckt. 64)[1]. The Debtor is a Georgia corporation which operates a CITGO gas station and convenience store located at 251 W. General Screven Way, Hinesville, Liberty County, Georgia 31313 (the "Property"). The disputed cash collateral is critical to the operation of the Debtor's business and is the only source from which to pay expenses and purchase inventory. Three creditors, Hinesville Loan Pool ("Hinesville"), Georgia Lottery Corporation ("Georgia Lottery"), and Cornerstone Bank ("Cornerstone") objected to the Debtor's proposed use of cash collateral.

The objections of Hinesville and Georgia Lottery have been resolved by consent orders. Hinesville, which holds a first in priority lien in the Debtor's real estate, and possibly other collateral as will be addressed in this opinion, will receive its regular monthly

---

[1] Also pending with the Court is creditor Cornerstone Bank's Motion for Relief from the Automatic Stay (dckt. 42). The Court will rule on this motion in a separate order.

payments that become due under its security deed and note with the Debtor. (Dckt. 60). Georgia Lottery will be able to continue to collect all proceeds from the Debtor's sale of lottery tickets under the terms of the contract between the Debtor and Georgia Lottery. (Dckt. 61).

Cornerstone, the remaining objecting creditor, holds a second in priority lien in the Debtor's real estate and claims a security interest in other collateral, including cash collateral. While Cornerstone's security agreement includes language granting a security interest in the Debtor's personal property, including inventory and its proceeds, Cornerstone failed to file a UCC-1 financing statement. Accordingly, Cornerstone holds an unperfected security interest in such property. For the reasons set forth below, the Debtor's Amended Cash Collateral Motion is GRANTED.

## I. JURISDICTION

This Court has subject-matter jurisdiction pursuant to 28 U.S.C. § 1334(a), 28 U.S.C. § 157(a), and the Standing Order of Reference signed by then Chief Judge Anthony A. Alaimo on July 13, 1984. This is a "core proceeding" within the meaning of 28 U.S.C. § 157(b)(2)(K) and (M). In accordance with Bankruptcy Rule 7052, the Court makes the following findings of fact and conclusions of law.

## II. FINDINGS OF FACT

On August 31, 2015, the Debtor filed a Chapter 11 petition for bankruptcy relief. (Dckt. 1). According to its Schedules, the Debtor's two principal creditors are Hinesville and Cornerstone. Hinesville has filed a proof of claim in the amount of $340,669.81, claiming a first priority lien in the Property and a security interest in other

personal property of the Debtor. (Claims Register 2-1). Cornerstone has filed a proof of claim in the amount of $220,116.80, claiming a second priority lien in the Property and also claiming a security interest in the Debtor's personal property. (Claims Register 4-2).

**A. Hinesville's Lien History**

On July 28, 2006, the Debtor executed a note in favor of The Coastal Bank in the amount of $450,000 ("HLP Note") in order to purchase the Property. (Claims Register 2-1, p. 8). To secure the loan, the Debtor executed a Real Estate Deed to Secure Debt ("HLP Security Deed") which gave The Coastal Bank a valid first lien on the Property. *Id.* at p. 10. The HLP Security Deed was recorded in the real property records of Liberty County, Georgia. The Coastal Bank was further secured by certain personal property described in the HLP Security Deed. Clause 28 of the HLP Security Deed provides in pertinent part:

> [The Debtor] grants to [The Coastal Bank] a security interest in all personal property located on or connected with the Property, including all farm products, inventory, equipment, accounts, documents, instruments, chattel paper, general intangibles, and all other items of personal property [Debtor] owns now or in the future and that are used or useful in the construction, ownership, operation, management, or maintenance of the Property . . . .

(Claims Register 2-1 at p. 15). On August 1, 2006, Coastal Bank filed a UCC-1 Financing Statement that listed its collateral as "all furniture, fixtures and equipment now owned or hereafter acquired and located at [the Property.]" *Id.* at p. 19.

On November 22, 2013, The Coastal Bank assigned its interest in the HLP Security Deed and the HLP Note to Hinesville. *Id.* at p. 33. On July 21, 2014, Hinesville filed an amended UCC-1 Financing Statement reflecting the assignment. *Id.* at p. 41. Hinesville's amended UCC-1 did not indicate any changes to the collateral described in Coastal Bank's

original UCC-1. *Id.*

### B. Cornerstone's Lien History

On September 5, 2013, Shree Meldishakti, Inc., a company affiliated with the Debtor, executed a promissory note in favor of Cornerstone in the principal amount of $207,000.00 ("Cornerstone Note"). (Dckt. 17). In order to secure payment of the Cornerstone Note, the Debtor executed a Deed to Secure Debt and Security Agreement ("Cornerstone Security Deed") and an Assignment of Leases and Rents ("Assignment of Rents"). (Claims Register 4-2, Exhibits 4 and 5). The Cornerstone Security Deed evidences a second in priority security interest in the Property and other personal property of the Debtor. (Dckt. 17). The description of the collateral in the Cornerstone Security Deed is stated in the broadest terms and includes, "inventory. . . including all . . . proceeds from a permitted sale of [the inventory]." (Dckt. 17, p. 6). With regard to the Debtor's personal property, in addition to the description of collateral in its introductory paragraphs, the Cornerstone Security Deed provides in pertinent part:

> 1.08 <u>Security Agreement</u>
>
> [The Debtor] hereby grants to [Cornerstone] a security interest in all of the Property which constitutes personal property or fixtures. . . .
>
> With respect to the machinery, apparatus, equipment, fitting, fixtures, building supplies and materials, articles of personal property, chattels, chattel paper, documents, inventory, accounts, farm products, consumer goods and general intangibles referred to or described in this Deed, or in any way connected with the use and enjoyment of the [Property], this Deed is hereby made and declared to be a security agreement as part of the [Property], in compliance with the provisions of the Uniform Commercial Code as enacted in the State of Georgia. . . .

*Id.* at p. 13. Section 1.09 further provides that all security interests "automatically attach, without further act, to all after-acquired property attached to and/or used in the operation of

the [Property] or any part thereof." *Id.* at p. 14. In the separately recorded Assignment of Rents, the Debtor provided as additional security for the loan and assignment of rents as follows: "[the Debtor] assigns, all of [the Debtor's] right, title and interest in, to and under any and all of those leases and rental agreements now existing and hereafter made . . . which cover or shall cover portions of [the Debtor's Property] . . . together with all of [the Debtor's] right, title and interest in and to all rents, issues and profits from the [leases and rental agreements] and from [the Debtor's Property]." Cornerstone recorded the Cornerstone Security Deed and Assignment of Rents in the real property records of Liberty County, Georgia, but did not file a UCC-1 Financing Statement.

### C. The Debtor's Original Motion to Use Cash Collateral

On September 17, 2015, Cornerstone filed a motion to prohibit the Debtor's use of cash collateral[2] or to condition such use on the Debtor providing adequate protection to Cornerstone ("Motion to Prohibit") (dckt. 17). Cornerstone argued that the Debtor was not entitled to use its cash collateral because Cornerstone had not consented to such use, nor had the Debtor obtained an order from this Court authorizing the use of cash collateral. (Dckt. 17). Cornerstone further argued that if the Debtor was permitted to use its cash collateral, it was entitled to adequate protection of its interest. *Id.*

On October 15, 2015, six weeks after this case was filed, the Debtor filed its Motion for Order to Use Cash Collateral Pursuant to 11 U.S.C. § 363 and Providing

---

[2] As will be explained, the purported cash collateral at issue consists of the pre-petition and post-petition proceeds from the sale of the Debtor's inventory that existed on the petition date. According to the Debtor's Schedule "B," the Debtor had, as of the petition date, approximately $200 cash on hand, $7,200 in its bank accounts, $51,000 in grocery inventory, $8,500 in gas inventory, and $9,500 in lottery inventory. (Dckt. 1).

Adequate Protection ("Original Cash Collateral Motion") (dckt. 27). Two parties, Hinesville and the Georgia Lottery Corporation, filed objections to the proposed use of cash collateral and adequate protection payments. Hinesville's objection[3] asserted that Cornerstone was not entitled to adequate protection payments unless the Debtor first made the full ongoing monthly payments to Hinesville under the Hinesville Security Deed and Hinesville Note. (Dckt. 40). Georgia Lottery's objection asserted that "[u]nder O.C.G.A. § 50-27-21(a), all proceeds from the sale of Lottery tickets or shares constitutes a trust fund until paid to the Lottery" and "[t]his code section places a fiduciary duty on the Debtor-in-Possession to preserve and account for lottery proceeds." (Dckt. 43). Accordingly, Georgia Lottery argued that such proceeds were being held in trust by the Debtor and are not a part of the Debtor's purported cash collateral. *Id.* Georgia Lottery further asserted that O.C.G.A. § 50-27-21(b) requires retailers to place all lottery proceeds in a separate bank account, and that the Debtor was not properly segregating its lottery proceeds. *Id.*

On October 27, 2015, this Court held a hearing on Cornerstone's Motion to Prohibit, the Debtor's Original Cash Collateral Motion, and the related objections of Hinesville and the Georgia Lottery Corporation[4]. At the hearing, it was stipulated by the

---

[3] Hinesville's objection was filed October 22, 2015 and actually opposed Cornerstone's Motion to Prohibit but made reference to the Debtor's Original Cash Collateral Motion. (Dckt. 40).

[4] At the hearing, the parties stipulated that the gross proceeds from the sale of lottery tickets are not property of the estate, and thus are not cash collateral. The parties further stipulated that after Georgia Lottery collects all money it is owed, the remaining commission from lottery sales would constitute potential cash collateral. The Court entered an Order reflecting such stipulations and sustaining the Georgia Lottery's objection on November 23, 2015. (Dckt. 61).

parties that Hinesville holds a first priority lien on the Debtor's Property and Cornerstone holds a second priority lien on the Debtor's Property. The parties further represented to the Court that Hinesville held a perfected first lien on the Debtor's cash collateral, while Cornerstone held a perfected second lien. Contrary to the parties' representations, as will be explained in this opinion, neither Hinesville nor Cornerstone hold a perfected lien in the Debtor's cash collateral.

Because the parties were not in agreement as to the terms of the Debtor's proposed cash collateral order, the Debtor, through its agent Rajankumar Patel[5], presented testimony regarding the Debtor's need to use cash collateral. While it was clear from Mr. Patel's testimony that the Debtor requires cash in order to purchase its inventory and stay in business, the Debtor's Original Cash Collateral Motion did not provide any financial information[6]. In addition, the financial information presented by Mr. Patel at the hearing was confusing, conflicting and unreliable. As a result, this Court entered an Order denying the Original Cash Collateral Motion and granting Cornerstone's Motion to Prohibit because the Debtor's motion did not provide the material terms of its proposed use of cash collateral

---

[5] Rajankumar Patel is the son of Kantilal Patel, the sole owner of the Debtor. Rajankumar Patel testified for his father in light of Kantilal Patel's limited ability to understand and communicate in English.

[6] Bankruptcy Rule 4001 requires a cash collateral motion to list or summarizes all material provisions, including (i) the name of each entity with an interest in the cash collateral; (ii) the purposes for the use of the cash collateral; (iii) the material terms of the use of the cash collateral; and (iv) any adequate protection that will be provided to each entity with an interest in the cash collateral. *See* Fed. R. Bankr. Pro. 4001(b)(1)(B).

required under Federal Rule of Bankruptcy Procedure 4001[7]. (Dckt. 60). However, the Court denied the Original Cash Collateral Motion without prejudice so that the Debtor could file an amended motion with adequate financial information. *Id.*

### D. The Debtor's Amended Motion to Use Cash Collateral

On December 4, 2015, the Debtor filed the instant Amended Cash Collateral Motion and attached certain financial information in the form of a proposed budget detailing the Debtor's average monthly income, costs of goods sold and expenses. (Dckt. 64). On December 18, 2015, the Court held a hearing on the Debtor's Amended Cash Collateral Motion. At this hearing, the Debtor presented additional evidence of the Debtor's current financial situation and its need to use cash collateral. In addition, the Debtor argued for the first time that Cornerstone failed to properly perfect its security interest in the Debtor's personal property, and thus does not have an interest in the Debtor's property that constitutes cash collateral within the definition of 11 U.S.C. § 363(a)[8]. Cornerstone stipulated that no UCC-1 financing statement had been filed, but contended its security interest in the cash

---

[7] The Court's Order (dckt. 60) also resolved Hinesville's objection as follows: "The Court finds that [Hinesville] is entitled to receive its regular monthly payments of $2,894.00 and to reinstate its automatic debit of the Debtor's operating account to be paid all future monthly payments, as well as the September and October 2015 payments owed to [Hinesville]."

[8] The Court noted in a previous Order that Hinesville's Security Agreement provided for a security interest in inventory and accounts receivable, but its UCC-1 failed to list such property. (Dckt. 60, n. 2). At the December 18, 2015 hearing, Hinesville did not dispute that it held an unperfected security interest in the Debtor's inventory. Regardless, any ruling on the use of cash collateral will not affect Hinesville because, as noted in footnote 8, above, this Court has already ordered that Hinesville is entitled to receive the regular monthly payments on its promissory note with the Debtor. *Id.* The payments to Hinesville do not represent adequate protection for its interest in cash collateral.

collateral was perfected when it filed its Cornerstone Security Deed and Assignment of Rents in the real property records of Liberty County. After hearing the parties' arguments, I took the matter under advisement. The Debtor and Cornerstone filed briefs in support of their respective positions. (Dckts. 73, 74).

## III. CONCLUSIONS OF LAW

### A. Standards for the Use of Cash Collateral

Pursuant to 11 U.S.C. § 363(c)(1), a debtor-in-possession[9] "may enter into transactions, including the sale or lease of property of the estate, in the ordinary course of business, without notice or a hearing, and may use property of the estate in the ordinary course of business without notice or a hearing." 11 U.S.C. § 363(c)(1). However, a debtor in possession is prohibited from using cash collateral in the ordinary course of business absent authorization by the court or consent from the entity that has an interest in the collateral. 11 U.S.C. § 363(c)(2). Cash collateral consists of "cash, negotiable instruments. . . deposit accounts, or other cash equivalents whenever acquired in which the estate and an entity other than the estate have an interest and includes the proceeds, products, offspring, rents or profits of property. . . *subject to a security interest as provided in section 552(b)* of this title, whether existing before or after the commencement of a case under this title" 11 U.S.C. § 363(a) (emphasis added).

As a general rule, post-petition revenue is not cash collateral. *In re Premier Golf Properties, LP*, 477 B.R. 767, 772 (B.A.P. 9th Cir. 2012). Under § 522(a), a creditor's

---

[9] 11 U.S.C. § 1107 gives a debtor-in-possession the rights and powers of a trustee serving in a Chapter 11 case.

pre-petition security interest does not extend to property acquired by the debtor post-petition even if there is an "after-acquired" clause in the security agreement. 11 U.S.C. § 522(a). The purpose of § 522(a) is "to allow a debtor to gather into the estate as much money as possible to satisfy the claims of all creditors." *Premier Golf*, 477 B.R. at 771 (citation omitted).

However, § 552(b) provides an exception to this rule. Section 552(b)(1) allows a pre-petition security interest to extend to post-petition property if the pre-petition security agreement creates a security interest in pre-petition property and its "proceeds, product, offspring, or profits" and the post-petition property constitutes such "proceeds, product, offspring or profits." 11 U.S.C. § 552(b)(1); *In re Cafeteria Operators, L.P.*, 299 B.R. 400, 405 (Bankr.N.D.Tex.2003). Additionally, § 552(b)(2) provides similar treatment for "amounts paid as rents of such property or the fees, charges, accounts, or other payments for the use or occupancy of rooms and other public facilities in hotels, motels, or other lodging properties." 11 U.S.C. § 552(b)(2); *Premier Golf*, 477 B.R. at 772. Read together, the provisions of § 363(c)(2) and § 552(b) protect a creditor's collateral from being used by a debtor post-petition if the creditor's security interest extends to one of the categories set out in § 552(b). *Id.* Put another way, a creditor is not entitled to the protections of §§ 363(c)(2) and 363(e) unless its security interest satisfies § 552(b). Cornerstone has the burden of establishing the existence and the extent of its interest in the property it claims as cash collateral. 11 U.S.C. § 363(p)(2); *In re Las Vegas Monorail Co.*, 429 B.R. 317, 328 (Bankr.D.Nev.2010).

The Debtor generates revenue from the sale of its inventory of gasoline and convenience store items (including beer, cigarettes and lottery tickets). By its terms,

AO 72A
(Rev. 8/82)

10

Cornerstone's security agreement extends to the Debtor's inventory and the proceeds from the sale of that inventory that existed on the petition date. Because Cornerstone's security interest extends to the Debtor's pre-petition inventory and proceeds, its security interest would therefore, pursuant to § 552(b)(1), extend to the post-petition proceeds of such pre-petition inventory. Accordingly, such post-petition proceeds would constitute "the proceeds . . . of property. . . subject to a security interest as provided in section 552(b)," and thus be the type of property defined as cash collateral within § 363(a). 11 U.S.C. § 363(a).

Based on its security agreement, Cornerstone argues that because it has a § 552(b) security interest in the Debtor's post-petition proceeds generated from the sale of the Debtor's pre-petition inventory, such proceeds are cash collateral. As discussed below, where the "interest" within the meaning of §363(a) is a security interest, it must be a perfected security interest for the proceeds to constitute cash collateral.

### B. A Security Interest Under 11 U.S.C § 363(a) Must Be A Perfected Security Interest

A predicate for the existence of "cash collateral" under 11 U.S.C. § 363(a) is that a creditor be "an entity [with] an interest" in the collateral. The Code, however, does not provide a definition of what it means to have such "an interest." One commentator has suggested that the language in § 363(a) is intentionally broad to deal with situations in which an entity has an interest, other than a security interest, in the cash or cash equivalents. 3 *Collier on Bankruptcy* 363.03[3], p. 363-29 (16th ed. 2013). For example, a bank with a right of setoff is treated as an entity with an interest in cash collateral notwithstanding that it does not have a security interest. *See National Bank of Ga. v. Air Atlanta, Inc. (In re Air*

*Atlantic, Inc.*, 74 B.R. 426 (Bankr. N.D. Ga. 1987). When dealing with security interests, however, most courts[10] find that only an entity with a *perfected* security interest in the subject collateral can have an "interest" in cash collateral within the meaning of § 363(a). *E.g., In re Wright Group*, 443 B.R. 795, 799 (Bankr. N.D. Ind. 2011) ("A predicate for the existence of 'cash collateral' under 11 U.S.C. § 363(a) is that a creditor have a perfected security interest in property of the debtor's estate."); *Southtrust Bank of Sand Mountain v. Fricks (In re Fricks)*, 58 B.R. 883, 885 (Bankr. N.D. Ala. 1986) ("[a]bsent a properly perfected security interest in after-acquired [property], proceeds from [such property] would not be property in which the estate and entity other than the estate have an interest, and, therefore the proceeds would not be subject to the limitations on use sought by the [creditor]"); 3 *Collier on Bankruptcy* 363.03[3], p. 363-29 (16th ed. 2013) ("Cash collateral also does not include cash to which the creditor's security interest has not attached or is not perfected."); *See also United Sav. Ass'n v. Timbers of Inwood Forest Assoc., Ltd.*, 484 U.S. 365, 374 (1988) ("Section 552(b) sets forth an exception, allowing postpetition 'proceeds, product, offspring, rents, or profits' of the collateral to be covered only if . . . the interest has been perfected under 'applicable nonbankruptcy law.'");

In reaching this conclusion, several of these courts appear to reason that the

---

[10]Some courts have held that an unperfected interest in cash collateral is still nonetheless an interest within the meaning of § 363(a), but any adequate protection afforded for such an interest would be minimal because a debtor has the ability to avoid unperfected security interests pursuant to § 544. *Scottsdale Medical Pavilion v. Mutual Benefit Life Ins. Co. (In re Scottsdale Medical Pavilion)*, 159 B.R. 295, 302 (BAP 9th Cir. 1993) ("if the creditor's interest in cash collateral is unperfected and therefore subject to avoidance under § 544, the interest to be protected is tenuous, and not deserving of much in the way of adequate protection); *See Las Vegas Monorail*, 429 B.R. at 340.

concept of "cash collateral" implies that a creditor has an enforceable security interest that could not be avoided by the debtor pursuant to 11 U.S.C § 544. *Wright Group*, 443 B.R. at 806 ("Absent a perfected security interest, the creditor's interest is avoidable by the debtor utilizing avoidance powers in Chapter 5 of the Bankruptcy Code, and the issue of cash collateral becomes moot."); *See In the Matter of Wheaton Oaks Office Partners Ltd. Partnership*, 27 F.3d 1234, 1244 (7th Cir. 1994) ("even if a party has a security interest under § 552(b), this same provision requires pre-petition security interests to survive the rigors of the trustee's "strong arm" powers under § 544 before they can reach cash collateral status"); *In re Chama*, 265 B.R. 662, 669 (Bankr. D. Del. 2000) (finding that a creditor whose security interest was avoided pursuant to 11 U.S.C. § 544 became a general unsecured creditor, and thus was not entitled to any adequate protection). Under § 544, a debtor-in-possession may avoid a security interest in the debtor's property when such security interest has not be perfected under applicable state law. *In re Chama,* 265 B.R. at 668. Accordingly, Cornerstone must have properly perfected its security interest in the Debtor's inventory and its proceeds to have an interest in the cash collateral as defined in § 363[11].

### C. Cornerstone's Security Interest is Unperfected

Absent a contrary federal statute, the acquisition and maintenance of security interests in a bankruptcy debtor's estate are determined by state law. *See Butner v. United*

---

[11] That this must be so can be illustrated by reference to adequate protection. Only if a security interest is perfected would granting adequate protection in the form of a replacement lien, as 11 U.S.C. § 361(2) allows, make sense. The Court would not grant a replacement lien superior to the original lien (i.e. provide a perfected security interest where none existed at the petition date). Adequate protection in the form of an unenforceable lien is no protection at all. In the event the case converted to chapter 7, the trustee would avoid the unenforceable lien and the creditor would be unsecured.

*States*, 440 U.S. 48 (1979). In this case, it is undisputed that the laws of the State of Georgia control the creation and perfection of Cornerstone's security interests. For claims governed by Georgia law, Article 9 of the Uniform Commercial Code ("Article 9") as enacted in Georgia, O.C.G.A. §§ 11-9-101 to 11-9-809 ("Georgia's Article 9"), outlines much of the law governing secured transaction, but it does not govern all security interests. In particular, Georgia's Article 9 does not apply to "the creation or transfer of an interest in or lien on real property, including a lease or usufruct or rents thereunder. . ." O.C.G.A. § 11-9-109(d)(11). Otherwise, Georgia's Article 9 governs "[any] transaction, regardless of form, that creates a security interest in personal property or fixtures by contract." O.C.G.A. § 11-9-109(a)(1).

The preliminary judicial inquiry into the validity of a security interest addresses two questions: has a security interest been created, and if so, has it been perfected. For security interests governed by Article 9, three conditions must be met before they may be enforceable against anyone, including the debtor. O.C.G.A. § 11-9-203. First, unless the secured party possesses the collateral, there must be a written security agreement signed by the debtor and containing a description of the collateral. Second, the secured party must have given value. And third, the debtor must have "rights in the collateral." O.C.G.A. § 11-9-109(b). These three elements have been met and Cornerstone's security interest in the Debtor's inventory and its proceeds[12] has been properly attached.

Although it is attachment that gives a secured party property rights in the

---

[12] O.C.G.A. § 11-9-315 provides that "a security interest attaches to any identifiable proceeds of collateral" and that security interest in the proceeds is deemed perfected "if the security interest in the original collateral was perfected." O.C.G.A §§ 11-9-315(a)(2) and 11-9-315(c).

collateral enforceable against the debtor, it is *perfection* that gives the secured party rights against conflicting claims of third parties. Where a security interest is governed by Article 9, perfection generally requires the proper filing of a financing statement. *See* O.C.G.A. § 11-9-310(a). The proper place to file a financing statement in order to perfect a security interest for Article 9 collateral is "[t]he office of the clerk of the superior court of any county of [Georgia]." O.C.G.A. § 11-9-501(a)(2). For security interests that fall outside the scope of Georgia's Article 9 by virtue of "the creation or transfer of an interest in or lien on real property, including a lease or usufruct or rents thereunder," a financing statement is not required. However, the secured party must still record such security interest with the clerk of the court in the county where the real property lies. O.C.G.A § 44-14-63.

Cornerstone contends its interest in the cash collateral is a product of its security interest in "all income, rents, issues, profits, and revenues of the [Property]" as set forth in the Cornerstone Security Deed. (Dckt. 17, p. 6). In addition, Cornerstone contends that its Assignment of Rents also creates a security interest in "all rents, issues, and profits from [leases] and from the [Property]." (Claims Register 4-2, Exhibit 5). Accordingly, it is Cornerstone's contention that its security interest in the Debtor's inventory and any proceeds therefrom are a product of the Debtor's use of the real property, and thus perfection of a security interest in such property falls within the real property exception of Georgia's Article 9.

In support of its position, Cornerstone relies on two cases from this District involving revenues generated from certain real property interests. *In the Matter of Chatham Parkway Self Storage, LLC*, 2013 WL 1898058 (Bankr. S.D. Ga. 2013); *In the Matter of*

*Resort Inns, Inc. d/b/a Ocean Plaza Beach Resort*, 2004 WL 2201252 (Bankr. S.D. Ga. 2004). Cornerstone's reliance on theses cases is misplaced. The Debtor has no rents or revenues from real property.

In *Chatham Parkway*, the debtor operated a self-storage facility that generated revenue from the rental of storage units, and the creditor claimed a security interest in all of such leases and the proceeds therefrom. The Court held that the creditor properly perfected its security interest in the revenue from the leases because it recorded the applicable security deed and assignment of rents in the appropriate real property records. In *Resort Inns*, the debtor operated a hotel which generated its revenues from the rental of its hotel rooms, and the creditor claimed a security interest in such revenues. Again, the court held that the creditor held a perfected interest because it filed the security agreement and assignment of rents in the appropriate real property records.

In these cases, the court was correct in finding such interests were properly perfected pursuant to real property law because "the creation . . . of an interest in . . . real property, including a lease . . . or rents thereunder" are expressly exempted from Georgia's Article 9. Therefore, such security interests may be properly perfected by filing the appropriate documents in the appropriate real property records. In the case at hand, however, the Debtor does not receive any revenue from the creation and assignment of a real property interest. Instead, as previously mentioned, the Debtor's revenue comes solely from the sale of its inventory, which constitutes personal property. Therefore, in order to perfect an interest in such personal property, Cornerstone must comply with the rules of perfection in Georgia's Article 9.

It is undisputed that the Cornerstone Security Deed grants Cornerstone a security interest certain personal property, including the Debtor's inventory and its proceeds. As explained above, Georgia's Article 9 requires the proper filing of a financing statement in order to perfect an interest in personal property. *See* O.C.G.A. § 11-9-310(a). Cornerstone does not dispute that a UCC-1 financing statement indicating its security interest in any of the Debtor's personal property has not been filed. Therefore, Cornerstone holds an unperfected security interest in the Debtor's personal property, including the Debtor's inventory and its proceeds, and thus Cornerstone is not "an entity [with] an interest" in cash collateral within the meaning of § 363(a), (c) and (e).

## IV. CONCLUSION

Cash collateral, by definition, requires that "the estate and an entity other than the estate have an interest" in such collateral. 11 U.S.C. § 363(a); *See* 11 U.S.C § 363(c)(2). Otherwise, there is no restriction on the debtor's use of such property of the estate in the ordinary course of its business. *See* 11 U.S.C. § 363(e). The Court holds that Cornerstone's unperfected security interest is not such an interest that meets the definition of cash collateral. Accordingly, the Court need not prohibit or condition the Debtor's use of that property in a manner that provides "adequate protection of such interest" to Cornerstone. 11 U.S.C. § 363(e). The Court will enter an order GRANTING the Debtor authorization to use its cash collateral in the ordinary course of its business without providing any further adequate protection to Cornerstone. The Court will enter a separate order consistent with the foregoing Findings of Fact and Conclusions of Law.

Dated at Savannah, Georgia, this 15th day of January, 2016.

/s/ Edward J. Coleman, III
Edward J. Coleman, III, Judge
United States Bankruptcy Court
Southern District of Georgia

AO 72A
(Rev. 8/82)

18