# In the United States Bankruptcy Court
## for the
## Southern District of Georgia
### Savannah Division

In the matter of: )
)
)  Chapter 11 Case
)
SHREE MELDIKRUPA INC. )
)  Number 15-41411-EJC
*Debtor.* )
)

FILED
Lucinda B. Rauback, Clerk
United States Bankruptcy Court
Savannah, Georgia
By dreese at 3:39 pm, Mar 22, 2016

## OPINION ON CORNERSTONE BANK'S MOTION FOR RELIEF FROM THE AUTOMATIC STAY

Before the Court is creditor Cornerstone Bank's ("Cornerstone") Motion for Relief from the Automatic Stay ("Relief Motion") (dckt. 42). Cornerstone seeks relief pursuant to 11 U.S.C. § 362(d)(1), alleging that its collateral, namely certain property located at 251 W. General Screven Way, Hinesville, Liberty County, Georgia 31313 ("Property"), is not being adequately protected and that the Debtor filed its bankruptcy petition in bad faith. (Dckt. 42). Cornerstone also seeks relief pursuant to § 362(d)(2), alleging that the Debtor does not have any equity in the Property and the Property is not necessary for an effective reorganization. *Id.* Cornerstone requests the Court to terminate the automatic stay so that it may proceed with a foreclosure of the Property. *Id.* For the reasons set forth below, Cornerstone's Relief Motion is DENIED.

## I. JURISDICTION

This Court has subject-matter jurisdiction pursuant to 28 U.S.C. § 1334(a), 28 U.S.C. § 157(a), and the Standing Order of Reference signed by then Chief Judge Anthony

A. Alaimo on July 13, 1984. This is a "core proceeding" within the meaning of 28 U.S.C. § 157(b)(2)(G). In accordance with Bankruptcy Rule 7052, the Court makes the following findings of fact and conclusions of law.

## II. FINDINGS OF FACT

On August 31, 2015, the Debtor filed a chapter 11 petition for bankruptcy relief. (Dckt. 1). The Debtor is a Georgia corporation which operates a CITGO gas station and convenience store located at the Property. The Debtor valued the real property at $485,605.00 in its Schedule A. *Id.* The Debtor has two principal creditors, Hinesville Loan Pool, LLC ("Hinesville") and Cornerstone. Hinesville holds a first priority lien in the Property and has filed a proof of claim in the amount of $340,669.81. (Claims Register 2-1). Cornerstone holds a second priority lien in the Property and has filed a proof of claim in the amount of $220,116.80. (Claims Register 4-2). The only other creditors in the Debtor's schedules are the Liberty County Tax Commissioner, listed as holding two unsecured priority claims totaling approximately $9,500.00, and Sarojben Patel, listed as holding a general unsecured claim of $25,000.00. In addition, the Internal Revenue Service has filed a proof of claim for an unsecured priority claim of $1,371.02 and a general unsecured claim of $110.58.

### A. Hinesville's Lien History

On July 28, 2006, the Debtor executed a note in favor of The Coastal Bank in the amount of $450,000.00 ("HLP Note") in order to purchase the Property. (Claims Register 2-1, p. 8). To secure the loan, the Debtor executed a Real Estate Deed to Secure Debt ("HLP Security Deed") which gave The Coastal Bank a valid first lien on the Property. *Id.* at p. 10.

The HLP Security Deed was recorded in the real property records of Liberty County, Georgia. On November 22, 2013, The Coastal Bank assigned its interest in the HLP Security Deed and the HLP Note to Hinesville. *Id.* at p. 33.

### B. Cornerstone's Lien History

On September 5, 2013, Shree Meldishakti, Inc., a company affiliated with the Debtor, executed a promissory note in favor of Cornerstone in the principal amount of $207,000.00 ("Cornerstone Note"). (Dckt. 17). This debt was incurred in connection with a Golden Corral restaurant in Hinesville that was owned by the affiliate company. In order to secure payment of the Cornerstone Note, the Debtor executed a Deed to Secure Debt and Security Agreement ("Cornerstone Security Deed") and an Assignment of Leases and Rents ("Assignment of Rents"). (Claims Register 4-2, Exhibits 4 and 5). The Cornerstone Security Deed evidences a second in priority security interest in the Property. *Id.* Cornerstone recorded the Cornerstone Security Deed and Assignment of Rents in the real property records of Liberty County, Georgia.

### C. The Cash Collateral Issue

After filing its bankruptcy petition, the Debtor continued to operate its business and use cash collateral without authorization under 11 U.S.C. § 363. On September 17, 2015, Cornerstone filed a motion to prohibit the Debtor's use of cash collateral or to condition such use on the Debtor providing adequate protection to Cornerstone ("Motion to Prohibit") (dckt. 17). On October 15, 2015, six weeks after this case was filed, the Debtor filed its Motion for Order to Use Cash Collateral Pursuant to 11 U.S.C. § 363 and Providing Adequate Protection ("Original Cash Collateral Motion") (dckt. 27). On October 27, 2015, this Court held a

hearing on Cornerstone's Motion to Prohibit and the Debtor's Original Cash Collateral Motion. At the hearing, the Debtor, through its agent Rajankumar Patel, presented testimony regarding the Debtor's financial situation and its need to use cash collateral to purchase inventory and stay in business. Because the Court found the financial information presented by Mr. Patel to be confusing, conflicting and unreliable, the Court denied the Original Cash Collateral Motion and granted Cornerstone's Motion to Prohibit.

On December 4, 2015, the Debtor filed its Amended Cash Collateral Motion and provided additional financial information, namely in the form of a proposed budget detailing the Debtor's average monthly income, costs of goods sold, and expenses. (Dckt. 64). On December 18, 2015, the Court held a hearing on the Debtor's Amended Cash Collateral Motion. At this hearing, the Debtor presented evidence of its current financial situation and its need to use cash collateral. On January 15, 2016, this Court entered an order granting the Debtor's Amended Cash Collateral Motion because the Court found that Cornerstone did not have an interest in the Debtor's cash collateral, and thus could not object to its use. (Dckt. 78, 79).

### D. Cornerstone's Relief Motion

On October 23, 2015, Cornerstone filed the instant Relief Motion seeking relief from the stay so that it may proceed with foreclosure of the Property. (Dckt. 42). In its motion, Cornerstone alleges that it is entitled to relief under 11 U.S.C. § 362(d)(2) because the Debtor does not have any equity in the Property and that the Property is not necessary for an effective reorganization. *Id.* Cornerstone further contends that "cause" for relief under § 362(d)(1) is present in this case because the Debtor filed for bankruptcy for the sole purpose

of stopping Cornerstone's previously scheduled foreclosure of the Property. (*Id.* at 29).

Cornerstone argues that the Property is not necessary for an effective reorganization because there is no prospect for a successful reorganization in this case. *Id.* Cornerstone's Relief Motion contained the following allegations with regard to the Debtor's prospects for a successful reorganization:

21.

Based on the Debtor's testimony at the 341 meeting of creditors held on September 28, 2015, the Debtor

1) runs its business "pretty inefficiently";
2) is losing money on the sale of gasoline;
3) has a shortage of groceries since it does not have money to fund grocery purchases for resale;
4) acknowledged that it was using cash collateral without permission;
5) paid a personal credit card expense of a principal of the Debtor with funds of the Debtor;
6) does not yet have an accountant because its prior accountant refused employment for fear of not being paid post-petition;
7) commingled funds of the Debtor with money of a related entity pre-petition;
8) admitted that it does not have adequate cash flow to pay its bills, even without paying the secured creditors; and
9) appropriated funds that were the property of the Georgia Lottery Commission to pay operating expenses.

. . .

24.

In its Amended Statement of Financial Affairs (the "Amended Statement") (Doc. 25), based on the Debtor's General Ledger, Debtor had an operating deficit of $11,902.16 on the day it filed bankruptcy.

. . .

31.

The Debtor admits that it is losing money on gasoline sales and not making nearly enough money on "indoor sales." While the Debtor suggests it would do better on gasoline sales if it rejected its petroleum contract (which would undoubtedly lead to a damages claim) and obtained a new contract, the Debtor has offered no evidence whatsoever either that a new contract is imminent or that the economics to the Debtor of a new contract would magically create a substantial increase in revenue.

(Dckt. 42).

On December 7, 2015, the Court held a hearing on Cornerstone's Relief Motion. As a preliminary matter, the parties agreed to the approximate value of the Property listed in Debtor's schedules of $485,000.00, and that based on this value, Cornerstone was undersecured and the Debtor had no equity in the Property. In addition to the arguments set forth in the Relief Motion, Cornerstone argued that the lack of adequate protection of its interest in the Property also constitutes "cause" for relief under 11 U.S.C. § 362(d)(1).

The Debtor, through its agent Rajankumar Patel ("Patel"), presented evidence regarding the feasibility of its proposed reorganization. Patel testified that, as of the hearing, the Debtor had approximately $35,000.00 in its operating account, but could not use these funds due to this Court's initial order denying the Debtor's proposed use of cash collateral. Patel further testified that the Debtor's principal, Kantilal Patel, had received "white knight" funds totaling $15,000.00 from friends and family to pay the Debtor's regular vendors and keep the business operating.

To increase income, Patel testified that the Debtor planned to reject its current petroleum contract with CITGO and sign a more profitable petroleum contract with Sunoco. However, Patel estimated that this would require the Debtor to pay $8,000.00 to buy out CITGO's contract and $20,000.00 to secure the Sunoco contract. Patel further testified that the Debtor plans to start accepting food stamps in the future, which could potentially increase the Debtor's income by $2,000.00 per month.

On December 18, 2015, in conjunction with the hearing on the Debtor's Amended Cash Collateral Motion, the Court held a continued hearing on the Relief Motion.

Again, the Court heard testimony from Patel regarding the Debtor's current financial situation. Patel testified that the "white knight" funds borrowed by Kantilal Patel to pay the Debtor's bills had increased to a total of $21,000.00. At the same time, Patel testified that the funds in the Debtor's operating account had increased to $43,000.00. Because the Court recognized that its pending decision on the Debtor's Amended Cash Collateral Motion would have a major impact on the feasibility of the Debtor's continued operations, and thus on stay relief, the Court took both matters under advisement.

### E. The Debtor's Financial Outlook

The Debtor's business, a gas station and convenience store, is a model of simplicity, and one very familiar to American consumers. This type of business can be run with a minimal staff, in this case family members, and with simple accounting methods. Because the Debtor's business does not require complicated bookkeeping, the Debtor's principal keeps handwritten records of the Debtor's day-to-day operations[1]. The Court recognizes that sophisticated accounting practices are neither common, nor necessary, for this type of business. However, to convert these weekly handwritten financial records into data useful for preparing tax returns and the monthly operating reports necessary for a successful reorganization under chapter 11, the Debtor recognized the need to employ an accounting professional. Nevertheless, the Debtor has had issues obtaining an accountant

---

[1] At the December 18, 2015 hearing, the Debtor's principal provided hand-written records of all payments to vendors and the corresponding check numbers, a list of inventory taken in and going out, and a list of unpaid bills. *See* Stay Relief Hr'g Exs. 1-4, Dec. 18, 2015.

7

and, to date, has not filed an application to employ an accountant in this case.[2]

In assessing the Debtor's financial situation, the Court reviewed the following financial documents provided by the Debtor: 2014 Form 1120S (dckt. 28), Amended Statement of Financial Affairs (dckt. 25), monthly operating reports for September 2015, October 2015, November 2015, December 2015, January 2016 and February 2016 (dckts. 56, 57, 71, 82, 84, 87), proposed budget attached to the Debtor's Amended Cash Collateral Motion (dckt. 64), and the five exhibits admitted at the December 18, 2015 hearing. In addition, the Court heard testimony from the Debtor, through its agent Rajankumar Patel, regarding the Debtor's current financial situation.

At least beginning in 2012, it appears that the Debtor has operated a successful business. The record reflects the following data regarding the gross revenue (i.e. volume of business) generated by the Debtor since 2012:

| Year | Gross Revenue[1] | Annual Income | Monthly Income |
|---|---|---|---|
| 2012 | $948,284.00 | $52,511.00 | $4,375.92 |
| 2013 | $759,417.00 | $47,925.00 | $3,993.75 |
| 2014 | $777,350.00[2] | $87,202.00 | $7,266.83 |
| [1] Dckt. 25, Statement of Financial Affairs ¶ 1 [2] Dckt. 28, 2014 Form 1120S ||||

For 2015, the revenue figures are conflicting, but still significant. The

---

[2] Notwithstanding the lack of an application to employ, it appears an accountant is providing some assistance in the preparation of monthly operating reports. On December 9, 2015, the Debtor wrote a check in the amount of $315.00 to Deborah S. Wasdin, the same accountant who prepared the Debtor's 2014 Form 1120S (dckt. 28). (Dckt. 82, p. 14). The memo line of this check read "for CPA." *Id.* Further, the December Operating Report indicates unpaid "Accounting Fees" of $2,260.30. (Dckt. 82, p.9).

8

Amended Statement of Financial Affairs reflects year-to-date revenues of $511,926.50 for the eight months ending August 31, 2015, which would yield $767,889.74 for twelve months, assuming no seasonal variance in the revenue. (Dckt. 25). However, on the petition date of August 31, 2015, the Debtor filed its Business Income and Expenses schedule reflecting "gross business income" for the previous 12 months of $699,753.71. (Dckt. 2). In this same schedule, the Debtor projected future gross monthly income of $62,948.14, which would be $755,376.00 over the succeeding twelve months. On October 15, 2015, the Debtor filed a separate Statement of Revenues, Expenses and Net Income reflecting gross income for the month of August 2015 of $68,042.73 (Dckt. 30).

Finally, the Debtor's monthly operating reports reflect somewhat depressed revenues during the pendency of this case:

| Month | Gross Revenues |
|---|---|
| September 2015 (Dckt. 56) | $52,038.89 |
| October 2015 (Dckt. 57) | $54,588.41[1] |
| November 2015 (Dckt. 71) | $45,283.52[2] |
| December 2015 (Dckt. 82) | $46,449.45 |
| January 2016 (Dckt. 84) | $48,241.96 |
| February 2016 (Dckt. 87) | $44,736.54 |

[1] This number reflects the actual income provided by the Debtor on its October 2015 monthly operating report. (Dckt. 57). However, the Statement of Revenues, Expenses & Net Income attached to this operating report indicates total revenue of $49,304.56. *Id.*

[2] The reduction in income in November can be explained in part by the fact that the Debtor stopped using its cash collateral in October 2015. During November, the cash on hand increased from $13,368.07 to $64,199.80. (Dckt. 71).

Overall, from a gross revenue standpoint, it appears there is sufficient customer traffic and

sales at the Debtor's location to be a viable business.

However, based on the current state of the record, the assessment of the Debtor's profitability is somewhat problematic. Again, the Debtor's business was profitable from 2012 to 2014. The Debtor's Amended Statement of Financial Affairs indicated ordinary income of $52,511.00 in 2012, $47,925.00 in 2013 and $87,202.00 in 2014. (Dckt. 25). In its Business Income and Expenses (dckt. 2) and the proposed budget attached to its Amended Cash Collateral Motion (dckt. 64), the Debtor projected that it will continue to operate at a profit. However, these two documents are somewhat conflicting as to the extent of such profit. The Business Income and Expenses estimates an average net monthly income of $3,087.48, while the proposed budget estimates an average net monthly income of $6,362.96. The Court recognizes that these documents provided by the Debtor may contain some "wishful thinking." However, the Debtor's September and October Monthly Operating Reports reflect that the Debtor's proposed budget is not far off as these operating reports show a net income of $6,254.78 and $5,283.85[1], respectively. (Dckt. 56, 57).

It appears from the Debtor's November and December Operating Reports, which reflect losses of $13,687.35 and $20,919.14 respectively, that the Debtor's temporary inability to use its cash collateral has negatively impacted its business operations. (Dckts. 71, 82). In addition, these operating reports indicate that the Debtor has accumulated a large amount of unpaid bills. However, these numbers may be somewhat misleading. For example, the January operating report reflects $118,059.67 of unpaid bills, of which $56,400.00 is for

---

[1] The October 2015 income statement reflects "net ordinary income" of only $609.06, but includes other income (from an undisclosed source) of $5,283.85.

"Georgia Lottery (scratch-offs)." (Dckt. 84). According to the Debtor, the amount owed to the Georgia Lottery includes the value of the Debtor's lottery ticket inventory and the proceeds from the sale of such lottery tickets that have yet to be claimed by the Georgia Lottery Corporation. (Dckt. 74, p. 17). Accordingly, the unsold lottery tickets in the Debtor's inventory combined with the proceeds generated from the sale of such lottery ticket should cover any liability owed to the Georgia Lottery Corporation[3]. *Id.*

As stated above, the Court entered an Order granting the Debtor use of its cash collateral on January 15, 2016. Since this date, it appears the Debtor has been able to pay its bills on time and prevent any further accumulation of post-petition liabilities. Although the January 2016 Operating Report indicates an overall increase in post-petition liabilities, it is likely due to the Debtor's continued inability to use its cash collateral for the first fifteen (15) days of the month. In its latest monthly operating report, the Debtor indicated that it paid all of its bills on time and generated net income of $3,662.68 for the month of February 2016[4]. (Dckt. 87).

### F. The Court's Concerns

After reviewing the financial information provided by the Debtor, the Court found a number of unexplained entries in those documents. First, the income statements attached to the Debtor's monthly operating reports provided sources of income and expenses

---

[3] As will be explained, the Court is unable to verify whether this is accurate based upon the financial documents provided by the Debtor.

[4] According to the February Monthly Operating Report, the Debtor still has nearly $65,000.00 of cash available which the Debtor will presumably use to reduce any outstanding post-petition liabilities.

without explanation in several instances. As an example, the December 2015 Profit & Loss statement listed a $26,179.12 expense under "8200 - Other Income/Expense." (Dckt. 82). The Court should not be left to speculate as to the nature of such a large, extraordinary expense.

Second, the Court has been unable to comprehend the nearly $50,000.00 of "unpaid bills" due to the Georgia Lottery. As explained above, the Debtor attempted to clarify how this figure is calculated and explained that this number represents the "amount owed to the Lottery as part of its three month inventory in lotto sales and is maintained by the Debtor of lotto in stock." (Dckt. 72, p. 17). However, the financial statements provided by the Debtor do not appear to be consistent with this explanation. In its January Monthly Operating Report, the Debtor indicated only $7,680.00 of lottery ticket inventory as compared to "unpaid bills" of $56,400.00 to Georgia Lottery. (Dckt. 84).

Last, as explained above, the Debtor's principal, Kantilal Patel received funds from friends and family to pay the Debtor's operating expenses when the Debtor was temporarily prohibited from using its cash collateral. According to the Debtor, the funds received by Kantilal were deposited into his individual account and then disbursed to the Debtor's vendors. Each month, the Debtor reported the total amount spent by Kantilal as an "unpaid bill" and current liability in its monthly operating reports. Accordingly, it appears as though the Debtor is treating the payments made by Kantilal as a form of post-petition financing. To date, no court approval has been sought to authorize the Debtor to obtain credit.

### III. CONCLUSIONS OF LAW

Under the Bankruptcy Code, the filing of a petition automatically stays most

judicial actions against the debtor. 11 U.S.C. § 362(a)(1). Congress enacted § 362(a) and its subsections "to give debtors 'breathing room' after filing their petition." *B.F. Goodrich Emps. Fed. Credit Union v. Patterson (In re Patterson)*, 967 F.2d 505, 512 n. 9 (11th Cir.1992). The automatic stay is "one of the fundamental debtor protections provided by the bankruptcy laws," which "permits the debtor to attempt a repayment or reorganization plan, or simply to be relieved of the financial pressures that drove him into bankruptcy." *Id.*

As the automatic stay provision may impose an unfair hardship on particular creditors, § 362(d) directs the bankruptcy court to grant relief from the stay "for cause," or when the debtor has no equity in the property and the property is unnecessary to an effective reorganization. 11 U.S.C. § 362(d)(1) and (2).

A. <u>11 U.S.C. § 362(d)(1) - Adequate Protection</u>

Section 362(d)(1) specifically provides that "the lack of adequate protection of an interest in property" is cause to lift a stay. 11 U.S.C. § 362(d)(1). The phrase "adequate protection" is given further context by § 361 of the Code, which reads, in pertinent part:

> When adequate protection is required under section 362 . . . of this title of an interest of an entity in property, such adequate protection may be provided by –
>
> (1) requiring the trustee to make a cash payment or periodic cash payments to such entity, to the extent that the stay under 362 of this title . . . results in a decrease in the value of such entity's interest in such property;
>
> (2) providing to such entity an additional or replacement lien to the extent that such stay . . . results in a decrease in the value of such entity's interest in such property; or
>
> (3) granting such other relief . . . as will result in the realization by such entity of the indubitable equivalent of such entity's interest in such property.

11 U.S.C. § 361.

Adequate protection is intended only to assure that a secured creditor, during the pendency of a bankruptcy case, does not suffer a loss in the value of its interest in the property of the bankruptcy estate. *United Sav. Ass'n v. Timbers of Inwood Forest Assocs., Ltd.*, 484 U.S. 365, 371 (1988). In *Timbers*, the Supreme Court held that an undersecured creditor is not entitled to adequate protection under 11 U.S.C. § 362(d)(1) for the delay caused by the automatic stay in foreclosing its collateral. *Id.* However, the Supreme Court did recognize that an undersecured creditor may receive adequate protection payments to guard against the possible devaluation of collateral during the reorganization process. *Timbers*, 484 U.S. at 370.

The party seeking relief from the automatic stay must establish a *prima facie* case of cause for relief. *In re George*, 315 B.R. 624, 628 (Bankr. S.D. Ga. Feb. 24, 2004). If the basis of the stay relief is lack of adequate protection of an interest in property, the nature of the movant's interest defines the need for adequate protection, and the scope of the *prima facie* case. As set forth in *Timbers*, an undersecured creditor lacks adequate protection if the value of its collateral is declining as a result of the stay. *Timbers*, 484 U.S. at 370. Therefore, an undersecured creditor must prove this decline in value, or threat of a decline, in order to establish a *prima facie* case. *In re Gunnison Ctr. Apts., LP*, 320 B.R. 391, 396 (Bankr. D. Colo. 2005). Only after that initial showing would the burden shift to the debtor to show that the creditor is adequately protected. 11 U.S.C. § 362(g).

Based on the parties' agreement at the Relief Motion hearings, this Court is satisfied that the Property is worth approximately $485,000.00. As noted, the outstanding indebtedness is $340,669.81 in favor of Hinesville, and $220,116.80 in favor of Cornerstone,

14

for a total of $560,786.61. Cornerstone, as the junior lienholder, is clearly undersecured. Therefore, under the ruling in *Timbers*, Cornerstone is not entitled to adequate protection unless it can show that the Property is declining in value. Here, it has not been shown that the secured value of Cornerstone's interest in the Property is declining. Accordingly, Cornerstone's interest is adequately protected, and it is not presently entitled to relief from the automatic stay for lack of adequate protection.

B. 11 U.S.C. § 362(d)(1) - Bad Faith

Because the Bankruptcy Code provides no definition of what constitutes "cause" under § 362(d), courts must determine whether discretionary relief is appropriate on a case-by-case basis. *See In re Feingold*, 730 F.3d 1268, 1277 (11th Cir. 2013). In the Eleventh Circuit, a debtor's lack of good faith in filing a petition for bankruptcy may be the basis for lifting the automatic stay. *In re Natural Land Corp.*, 825 F.2d 296 (11th Cir. 1987).

Although there is no precise test for determining bad faith, courts have recognized factors which show an "intent to abuse the judicial process and the purposes of the reorganization provision." *Barclays-Am./Bus. Credit, Inc. v. Radio WBHP, Inc. (In re Dixie Broad., Inc.)*, 871 F.2d 1023, 1026 (11th Cir.1989) (citations omitted). These factors include the timing of the filing of the petition, whether the debtor is financially distressed, whether the petition was filed strictly to circumvent pending litigation, and whether the petition was filed solely to reject an unprofitable contract. *Id.*

In this case, the Court finds that the Chapter 11 petition was not filed in bad faith, and that the relief requested by Cornerstone under § 362(d)(1) is not warranted. Although this case may have been filed one day before Cornerstone's scheduled foreclosure

of the Property, the Court is satisfied that the case does not represent "an intent to abuse the judicial process and the purposes of reorganization provisions."

The financial information provided by the Debtor shows a historically profitable business. As stated previously, the Statement of Financial Affairs indicates the Debtor has realized an average net income of approximately $60,000 per year. In addition, the small number of creditors in this case indicates that the Debtor has serviced its debts in the past. In fact, Hinesville's counsel acknowledged at the December 18, 2015 hearing that the Debtor has never been in default on the HLP Note. As the Debtor's agent, Patel, testified, the business started experiencing financial difficulties when it became burdened with the $6,461.61 monthly payment on the Cornerstone Note. Because the Debtor was unable to afford these payments, it defaulted on the Cornerstone Note. Subsequently, Cornerstone started the foreclosure process on its collateral, the Property. After negotiations between the Debtor and Cornerstone failed, the Debtor made the decision to file for chapter 11 to avoid foreclosure and keep the business operating.

This appears to be a straightforward case in which the Debtor experienced financial difficulties and faced the potential loss of its primary asset through Cornerstone's foreclosure action. The Debtor filed the chapter 11 petition to prevent such a loss, a permitted use of the bankruptcy system. *In re Bellevue Place Associates*, 171 B.R. 628, 634 (Bankr.N.D.Ill.1994). Although the Debtor has yet to file a plan of reorganization, the Debtor, through its agent Rajankumar Patel, has indicated that it intends to pay Cornerstone in full. Accordingly, the Court believes the Debtor filed this case in an honest attempt to reorganize its debts and should be given the opportunity to do so.

C. <u>11 U.S.C. § 362(d)(2)</u>

To grant a motion for relief from stay under § 362(d)(2), the Court must find that there is no equity in the property and that the property is not necessary to an effective reorganization. 11 U.S.C. § 362(d)(2). Since the parties have stipulated that the Debtor has no equity in the Property, the issue is whether the Property is necessary for an effective reorganization.

In order to establish that the Property is necessary for an effective reorganization, the burden is on the Debtor to show "a reasonable possibility of a successful reorganization within a reasonable time." *United Sav. Ass'n of Texas v. Timbers of Inwood Forest Assoc.*, 484 U.S. 365, 376 (1988); 11 U.S.C. § 362(g). "What this requires is not merely a showing that if there is conceivably to be an effective reorganization, this property will be needed for it; but that the property is essential for an effective reorganization that is in prospect." *Id.* at 375-76. Debtor must demonstrate that "an effective reorganization is realistically possible; the mere fact that property is indispensable to the debtor's survival is insufficient." *Albany Partners, Ltd. v. Westbrook (In re Albany Partners, Ltd.)*, 749 F.2d 670, 673, n. 7 (11th Cir. 1984).

When considering the debtor's burden of proof under § 362(d)(2)(B), several courts have implemented a "sliding scale" approach (i.e. the burden enlarges as the bankruptcy case progresses). During the period in which debtors have an exclusive right to file a plan of reorganization, *see* 11 U.S.C. § 1121(b), (c)(2), these courts apply a lesser standard in determining whether the burden of showing "a reasonable possibility of a successful reorganization within a reasonable time" has been satisfied. *See Timbers* 484 U.S.

at 376; *In re Saraland, LLLP*, No. 12-30113, 2013 WL 1403424 at *6 (Bankr. S.D. Ga. Mar. 27, 2013) (J. Barrett); *Am. Network Leasing, Inc. v. Apex Pharm., Inc. (In re Apex Pharm., Inc.)*, 203 B.R. 432, 441-42 (N.D. Ind. 1996). However, once such exclusivity period expires, the Debtor must provide a more stringent and convincing showing under § 362(d)(2)(B). *See In re Holly's Inc.*, 140 B.R. 643, 702 (Bankr. W.D. Mich. 1992).

The Debtor filed its petition for relief under chapter 11 of the Bankruptcy Code on August 31, 2015. In this case, the Debtor's exclusive period to file a plan of reorganization ended on February 27, 2016. Because this period had yet to expire at the time of the hearings, the Court will apply a lesser standard in determining whether the burden of showing "a reasonable possibility of a successful reorganization within a reasonable time" has been satisfied.

Cornerstone argues there is no reasonable possibility of reorganization because any proposed plan in this case cannot be confirmed due to Cornerstone's resolute opposition to the Debtor's reorganization and the Debtor's inability to satisfy the absolute priority rule. However, this argument is ineffective at this stage of the case. The test under § 362(d)(2) is one of feasibility, not confirmability. The debtor need not show that the plan is confirmable, but that "the things which are to be done after confirmation can be done as a practical matter." *In re Ritz-Carlton of D.C., Inc.*, 98 B.R. 170, 172 (S.D.N.Y.1989). *See Saraland*, 2013 WL 1403424 at *8.

It is undisputed that the Debtor's revenues are derived solely from the operation of its business, and the Property is necessary for the Debtor to effectively reorganize. However, the Debtor must still present sufficient evidence to demonstrate that

AO 72A
(Rev. 8/82)

a successful reorganization within a reasonable time is possible. After reviewing the financial information provided by the Debtor and hearing testimony regarding the Debtor's current financial situation, the Court finds the Debtor has met its burden in showing there is a reasonable possibility of a successful reorganization.

The financial information and testimony presented by the Debtor tends to show that its business has and will continue to operate at a profit. After comparing the Debtor's historical financial information and projected cash flows, the Court finds it reasonable that the Debtor's business can generate an average monthly income of $5,000.00. Although the Debtor's most recent monthly operating reports have shown a negative income, the Court believes this is not an accurate representation of the Debtor's current financial situation. Instead, it is more likely that the negative income is a direct result of extraordinary expenses caused by the Debtor's initial inability to use its cash collateral. The Debtor presented further testimony of potential changes it could make to increase its income, including entering into a more profitable petroleum contract, accepting food stamps, and expanding its operating hours. The Court is satisfied that these proposed changes are within reason and could potentially result in an increase in the Debtor's income.

Because the Debtor has yet to propose a plan in this case, the Court will not speculate as to the exact provisions of the Debtor's plan. However, the likelihood of the Debtor's successful reorganization is aided by having only a few creditors. As mentioned previously, the Debtor has only two principal creditors, Hinesville and Cornerstone. Hinesville's debt is fully secured by the Property and has continued to receive its regular monthly payments under the Note throughout the bankruptcy. Cornerstone holds an estimated

secured claim of $159,562.83 and an estimated unsecured claim of $60,553.97. The remaining debts include approximately $10,000 in unsecured priority tax claims and a $25,000 unsecured loan from a family member. Accordingly the Debtor's projected monthly income of $5,000.00 would likely be sufficient to service its remaining debts within a reasonable time.

### IV. CONCLUSION

"Cause" does not exist pursuant to § 362(d)(1) to warrant modification of the automatic stay with respect to the Property for bad faith or lack of adequate protection. Additionally, even though the Debtor has no equity in the Property, it is necessary for an effective reorganization. The Court will enter a separate order consistent with the foregoing Findings of Fact and Conclusions of Law.

Dated at Savannah, Georgia, this 22nd day of March, 2016.

Edward J. Coleman, III, Judge
United States Bankruptcy Court
Southern District of Georgia